UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

PAUL KOKKINIS, Individually and on Behalf :
of All Others Similarly Situated,

                                   Plaintiff,

      vs.

AEGEAN MARINE PETROLEUM
NETWORK INC., NIKOLAS E.
TAVLARIOS, PETER GEORGIOPOULOS
and SPYROS GIANNIOTIS,

                         Defendants.

———————————————————————— x

Civil Action No.

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES
LAWS

JURY TRIAL DEMANDED

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Aegean Marine Petroleum Network, Inc. ("Aegean Marine" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action on behalf of purchasers of the common stock of Aegean Marine between January 4, 2010 and February 3, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Moreover, the Company maintains its executive offices in this District.

5.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff Paul Kokkinis, as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of Aegean Marine during the Class Period and has been damaged thereby.

7.      Defendant Aegean Marine operates as a marine fuel logistics company that physically supplies and markets refined marine fuel and lubricants to ships in port and at sea.  The Company maintains its executive offices at 299 Park Avenue, 2nd Floor, New York, New York 10171.

8.      (a)      Defendant Nikolas E. Tavlarios ("Tavlarios") is, and was at all relevant times, Principal Executive Officer and President of Aegean Marine.

        (b)      Defendant Peter Georgiopoulos ("Georgiopoulos") is, and was at all relevant times, Aegean Marine's Chairman of the Board.

        (c)      Defendant Spyros Gianniotis ("Gianniotis") is, and was at all relevant times, Chief Financial Officer of Aegean Marine.

        (d)      Defendants Tavlarios, Georgiopoulos and Gianniotis are referred to herein as the "Individual Defendants."

9.      During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Aegean Marine, were privy to confidential and proprietary information concerning Aegean Marine, its operations, finances, financial condition and present and future business prospects.  The Individual Defendants also had access to material adverse non-public information concerning Aegean Marine, as discussed in detail below.  Because of their positions with Aegean Marine, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other

- 2 -

information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

10.    The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Aegean Marine's business.

11.    The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

12.    As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Aegean Marine's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become

materially misleading or untrue, so that the market price of Aegean Marine's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Aegean Marine's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Aegean Marine's business, operations and management and the intrinsic value of Aegean Marine's securities; (ii) enabled the Company to complete a public offering of its shares whereby the Company sold approximately 4.5 million shares and reaped over $147 million in gross proceeds; and (iii) caused Plaintiff and members of the Class to purchase Aegean Marine common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

14.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Aegean Marine between January 4, 2010 and February 3, 2011, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

15.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Aegean Marine common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may

- 4 -

be identified from records maintained by Aegean Marine or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

16.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

17.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

18.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Aegean Marine;

(c)     whether the price of Aegean Marine common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

19.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

20.     Defendant Aegean Marine describes itself as an "international marine fuel logistics company that markets and physically supplies refined marine fuel and lubricants to ships in port and at sea.  The Company procures product from various sources (such as refineries, oil producers, and traders) and resells it to a diverse group of customers across all major commercial shipping sectors and leading cruise lines."

21.     The Class Period begins on January 4, 2010.  On that date, Aegean Marine issued a press release announcing the acquisition of "Verbeke Bunkering N.V., a leading physical supplier of marine fuel in the Antwerp-Rotterdam-Amsterdam (ARA) region."   Defendant Tavlarios, commenting on the acquisition, stated, in pertinent part, as follows:

> The accretive acquisition of Verbeke represents our largest acquisition to date, positioning Aegean well to significantly increase future sales volumes and strengthen the Company's global brand recognition.  Based on its extensive operating history and strong reputation for high-quality service, Verbeke has built a leading market position in the ARA region.  We intend to capitalize on the favorable growth prospects in the world's second largest bunkering market and meet the demand for our comprehensive marine fuel services.  In addition to establishing a strategic presence in this important region with considerable ship traffic, we expect to realize meaningful operating synergies with our Belgium-based subsidiary, Bunkers at Sea, which Aegean acquired in 2007.

> Including our latest acquisition, Aegean has more than tripled its global reach since the Company's IPO in December 2006.  Consistent with management's opportunistic approach to consolidating the marine fuel supply industry in a disciplined manner, we expect to further expand Aegean's global market share and increase the Company's earnings power.

Defendant Gianniotis stated, in pertinent part, as follows:

> We are pleased to continue to successfully execute Aegean's growth strategy while adhering to our strict return requirements.  This acquisition further expands our global marine fuel platform, enhancing our ability to meet the needs of our blue-chip customers that operate on a worldwide basis.  We plan to draw upon our revolving

credit facilities and seek alternative financing to support our growth initiatives. In maintaining our commitment to enter new markets, we remain focused on expanding Aegean's industry leadership and creating long-term value for shareholders.

22.     In reaction to the announcement, the price of Aegean Marine stock rose $3.94 per share, or 14%, to close at $32.47 per share, on heavy trading volume.

23.     On January 19, 2010, the Company issued a press release announcing that it intends to offer 3,906,000 shares of its common stock in an underwritten public offering. The Company stated that it "intends to use the net proceeds from this offering to fund certain corporate acquisitions and for general corporate purposes."

24.     On January 21, 2010, the Company priced its public offering at a price of $32.75 per share. In connection with the offering, the Company filed and disseminated a registration statement, which incorporated a prospectus (the "Registration Statement"). The Registration Statement contained numerous statements about the Company and its operations.

25.     On January 25, 2010, the Company announced that the underwriters exercised in full their option to purchase an additional 585,900 common shares at the public offering price of $32.75 per share. The exercise of the option brings the total shares of common stock to be sold by the Company in the offering to 4,491,900 shares. The offering was completed on January 27, 2010.

26.     On February 24, 2010, Aegean Marine issued a press release announcing its financial results for the fourth quarter and year end of 2009, the period ended December 31, 2009. For the quarter, the Company reported net income on an adjusted basis of $14.8 million, or $0.35 basic and diluted earnings per share, and total revenues of $851.8 million. Defendant Tavlarios commented on the results, stating, in pertinent part, as follows:

> Our record performance for the fourth quarter and full year 2009 highlights our significant success in executing management's business plan during a global economic recession and further strengthens Aegean's industry leading brand. In maintaining our commitment to profitable growth, we increased sales volumes and net income by 19.1% and 21.6%, respectively, in 2009 compared to the year-earlier

- 7 -

period while actively managing counterparty risk and expanding our future earnings potential. Specifically, we entered three new markets this past year, expanding our presence to 14 strategic locations worldwide. Building upon our new operations in Trinidad and Tobago, Tangiers, Morocco and Patras, Greece, we agreed to acquire Verbeke Bunkering N.V., a leading physical supplier of marine fuel in the vast Antwerp-Rotterdam-Amsterdam region, the world's second largest bunkering market. Including the Verbeke acquisition, which is scheduled to close in March of 2010, Aegean has more than tripled its global reach since the Company's IPO in December of 2006.

Complementing the robust growth in our service network, we continued to expand our high-quality logistics infrastructure with the delivery of 11 double-hull bunkering vessels in 2009 and year-to-date, including seven newbuildings. As we continue to enhance our competitive advantage and meet the strong demand for modern tonnage, we intend to draw upon our considerable financial flexibility and take delivery of 14 additional double-hull bunkering tanker newbuilds for the remainder of 2010. By expanding our integrated marine fuel platform from procurement to delivery as we have consistently done in the past, we expect to further strengthen our leadership position as a full-service independent supplier of marine fuel to blue-chip customers and drive future sales volume growth.

Defendant Gianniotis also commented on the results, stating, in pertinent part, as follows:

Aegean's record financial results demonstrate the continued success we have achieved in entering new strategic markets and expanding our modern bunker delivery fleet. In addition to the execution of our growth strategy, we took advantage of our significant working capital base, a core differentiator for our Company, to drive sales volume growth in our existing markets. During 2009, we further enhanced our access to capital by securing new credit under favorable terms, increasing our total to $420 million in working capital credit facilities. In addition to expanding our relationships with top global lending institutions, we completed a $147.1 million equity offering in the first quarter of 2010, underscoring the ongoing support Aegean has received from the capital and banking markets. With a strong financial foundation firmly in place, we remain well positioned to continue to increase our global market share and capitalize on additional consolidation opportunities that drive long-term value for shareholders.

27.    Following the issuance of the press release, Aegean Marine held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants made numerous positive statements about the Company's business, operations and prospects. Specifically, Defendant Tavlarios stated, in pertinent part, as follows:

During the three months ended December 31, 2009 sales volume, a key driver of our business, rose 11.4% from the year earlier period to 1,748,308 metric tons. This

increase was primarily due to sales volume growth in Singapore and the United Arab Emirates as well as contributions from our new markets located in the Southern Caribbean and Tangiers, Morocco which did not record a sales volume in Q4 of 2008.

With regard to the Verbeke acquisition, Defendant Tavlarios stated, in pertinent part, as follows:

Building upon our considerable success we agreed to acquire Verbeke Bunkering at the beginning of 2010. Verbeke is a leading physical supplier of marine fuel in the Antwerp, Rotterdam, Amsterdam, or ARA, region, the world's second largest bunker market with more than 20 million metric tons of marine fuel supplied annually. The company which is majority owned by the fourth generation of the Verbeke family, significantly expands Aegean's global brand recognition and provides strong growth potential in both sales volume and margin as we expect to realize operating synergies with our Belgium based subsidiary, Bunkers at Sea.

For the year ended December 31, 2009 the volume of marine fuel sold by Verbeke totaled approximately 3,500,000 metric tons. Including the Verbeke acquisition which is scheduled to close in March of 2010, Aegean has more than tripled its global presences going public. Going forward, we intend to continue to utilize our strong capital position and consolidate the fragmented marine fuel industry in a manner that meets our strict return criteria. In meeting this critical objective, we expect to further strengthen our leadership position as an independent supplier of marine fuel on a worldwide basis and drive future sales volume growth.

28.     On May 13, 2010, Aegean Marine issued a press release announcing its financial results for the first quarter of 2010, the period ended March 31, 2010. For the quarter, the Company reported net income of $14.1 million, or $0.31 basic and $0.30 diluted earnings per share, and total revenues of $843.4 million. Defendant Tavlarios commented on the results, stating, in pertinent part, as follows:

We are pleased by our strong start to 2010 as we continue to execute our well-capitalized growth strategy and expand our industry leadership for the physical supply of marine fuel on a worldwide basis. During the first quarter, sales volumes climbed 31.3% compared to the year-earlier period while management strengthened the Company's future prospects. Specifically, we completed the accretive acquisition of Verbeke Bunkering N.V., solidifying our presence in the Antwerp-Rotterdam-Amsterdam region, the world's second largest bunkering market. In addition, we took delivery of three bunkering tanker newbuildings in the first quarter.

Consistent with our goal to increase sales volumes and ensure we provide reliable service for our customers, we also acquired a double-hull Panamax tanker in the quarter that will be used as floating storage. Complementing our efforts, we are

currently developing onshore storage facilities in the UAE, Jamaica and Morocco as we intend to grow our market share in these attractive regions. The substantial success we have achieved in expanding our fully integrated marine fuel solution from procurement to delivery, combined with our significant access to capital, positions Aegean Marine well to drive future performance and strengthen the Company's global brand recognition.

Defendant Gianniotis also commented on the results, in pertinent part, as follows:

Our strong results for the first quarter of 2010 were led by sales volumes growth in Singapore and the U.A.E. as well as contributions from new markets in Morocco and Trinidad and Tobago. During the quarter, we strengthened our balance sheet by completing a share offering that generated net proceeds of approximately $139.0 million, underscoring our short-term and long-term prospects. Our considerable financial strength provides a significant competitive advantage for our Company. Going forward, we intend to capitalize on additional consolidation opportunities under favorable terms that further expand our leading role as a global independent supplier of marine fuel and increase our earnings potential for the benefit of shareholders.

29.     Following the issuance of the press release, Aegean Marine held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants made numerous positive statements about the Company's business, operations and prospects. Specifically, Defendant Tavlarios stated, in pertinent part, as follows:

During the three months ended March 31, 2010, sales volume, a key driver of our business, rose 31.3% from the year-earlier period to 1,720,513 metric tons. This increase was primarily due to sales volume growth in Singapore and the United Arab Emirates as well as contribution from our new markets located in Trinidad and Tobago and Tangiers and Morocco, which had not yet commenced operations in Q1 2009.

*     *     *

DOUG MAVRINAC, ANALYST, JEFFERIES & COMPANY: Thank you, operator. Good morning, guys. Just had a handful of questions. And the first is a follow-up on something Spyros mentioned. So for April, you guys sold 672,000 tons ex Verbeke. That's a huge number. Is that a record?

NIKOLAS TAVLARIOS: Yes, definitely. That is a record. 672,000 tons in April excluding Verbeke, which was just under 270,000 tons.

DOUG MAVRINAC: Okay, got you. I figured as much because just given how big it was.

- 10 -

And then, Nick, as it relates to May, I realize that we're not even halfway done with May, but would you say market conditions are as favorable as they were in April? Or has anything changed materially since then to make us think that that run rate may not be different than it was in April?

NIKOLAS TAVLARIOS: Well, you're right, it's a little early to say about May. But I can say that May does look even a bit stronger than April did.

DOUG MAVRINAC: Okay. That's excellent to hear.

With regard to the Verbeke acquisition, Defendant Gianniotis stated, in pertinent part, as follows:

During the month of April, 2010, we recorded total sales volumes of approximately 672,000 metric tons, which excludes sales volumes from our Amsterdam or Rotterdam Antwerp market, and representing a higher rate compared to Q1 sales volumes.

The other market, formally Verbeke, reported sales volumes of approximately 267,000 metric tons in April of 2010, as planned.

With regard to the Verbeke acquisition, Defendant Tavlarios added, in pertinent part, as follows:

As I mentioned earlier on the call, we completed the accretive acquisition of our Verbeke Bunkering, a leading physical supplier of marine fuel in the Antwerp, Rotterdam, Amsterdam, or ARA, region. This broad region is the second-largest bunkering market in the world with more than 20 million metric tons of marine fuel supplied annually.

Based on its long-standing history, Verbeke has built a leading market position throughout the entire ARA region covering surrounding ports, including Gent, Zeebrugge, Flushing, Terneuzen and Sluiskil, in addition to Antwerp Rotterdam and [Antwerp]. By solidifying our presence in this critical region, we expect to strengthen our global brand recognition and drive future sales volume growth.

*       *       *

URS DUR: Yes. Okay, good. Nice improvement there.

Excellent. Verbeke is fully online then for you guys? Can you -- has the EBITDA ideas that you gave us at the time of the acquisition, has that changed in any way?

NIKOLAS TAVLARIOS: Yes, well, there's been some efficiency that we've identified, not in terms of how the operation goes. And that's really it. But it's executed -- and this quickly, it's executed right on plan. And we are really happy about how the integration is going.

30.     The statements referenced above in ¶¶ 21, 24 and 26-29 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)     that the Company was experiencing declining demand for its products and services, especially in the Singapore and Rotterdam ports;

(b)     that the Company was reducing its prices in competitive markets, which had a significant impact on its profit margins;

(c)     that the Company's acquisition of Verbeke was not performing according to internal expectations; and

(d)     as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company and its prospects.

31.     On August 11, 2010, Aegean Marine issued a press release announcing its financial results for the second quarter of 2010, the period ended June 30, 2010. For the quarter, the Company reported net income of $12.0 million, or $0.25 basic and diluted earnings per share, and total revenues of $1,336.6 million. Defendant Tavlarios commented on the results, stating, in pertinent part, as follows:

> During the second quarter, Aegean Marine continued to expand its global market share for the physical supply of marine fuel, enabling the Company to increase both sales volumes and EBITDA by 88.5% and 12.7%, respectively, compared to the year-earlier period. Consistent with management's strategy to expand its brand and scale, we completed the acquisition of Verbeke Bunkering at the onset of the second quarter, cementing our presence in the world's second largest bunkering market. Building upon our success, we acquired the Shell Las Palmas terminal in the Canary Islands, which lie along major trans-Atlantic seaborne trade routes. Importantly, the terminal includes dedicated land storage facilities that broaden our new onshore storage facilities under development in, Jamaica, Morocco and the UAE where we expect to commence construction of a facility with approximate capacity of 3 million barrels in September 2010. Including our latest acquisition, which closed in July 2010, Aegean Marine has more than tripled its vast global network to 16 markets covering over 40 ports compared to 5 at the time of our IPO in December 2006.

In addition to penetrating new markets and increasing our in-land storage capacity, we further enhanced our high-quality logistics infrastructure with the delivery of three double-hull bunkering tanker newbuildings in the second quarter and one to date in the current third quarter. Going forward, we expect to complete our fully financed newbuild program with the delivery of nine remaining double-hull bunkering tanker newbuildings over the next six months. By expanding our fully integrated marine fuel platform from procurement to delivery, combined with our burgeoning marine lubricant business, we remain well positioned to strengthen our global brand recognition and increase the Company's earnings power.

Defendant Gianniotis also commented on the results, stating, in pertinent part, as follows:

Our operating results for the second quarter of 2010 were led by sales volumes growth in our core markets as well as notable contributions from our wholly owned subsidiary, Verbeke Bunkering, which we acquired on April 1, 2010. As we successfully integrated the largest acquisition in Aegean Marine's history, we further enhanced the Company's financial position. Specifically, we secured new credit facilities and expanded existing facilities under favorable terms with global lending institutions in aggregate of approximately $185 million, increasing our current total to more than $700 million in working capital credit facilities. Our significant access to capital provides a distinct competitive advantage as we continue to meet the strong demand for Aegean Marine's integrated marine fuel services and execute management's growth strategy.

32.    Following the issuance of the press release, Aegean Marine held a conference call with analysts and investors to discuss the Company's earnings and operations. With regard to the Company's sales volume in Singapore and Rotterdam, among others, Defendant Gianniotis stated, in pertinent part, as follows:

I will now provide a brief overview on the performance of the markets we serve. During the second quarter, while Aegean Marine experienced increased competition, as well as market volatility in selected ports, the Company took advantage of its diverse geographical sales mix and the global supply of marine fuel to generate strong results. Specifically, our core markets located in the UAE and Singapore increased sales volumes as we continued to take advantage of our leading brand and significant financial liquidity. Greece also performed well in the second quarter, due to the element of (inaudible) in this market from the summer cruise business. In northern Europe, which includes both Verbeke and bunkers at sea, we reported strong sales volumes in Q2 as we continued to integrate our operations and capitalize on the favorable growth prospects in this vast region.

With regard to the Verbeke acquisition, Defendant Tavlarios stated, in pertinent part, as follows:

- 13 -

I will now provide a brief overview of our Company's strategy, beginning on slide 16, which illustrates the significant growth in Aegean Marine's global presence. As I mentioned earlier, we recently completed the accretive acquisition of Verbeke Bunkering, solidifying our presence in the Antwerp, Rotterdam, Amsterdam region, the world's second-largest bunkering market, behind only Singapore, with more than 20 million metric tonnes of marine fuel supplied annually. We are very pleased with Verbeke's performance in Q2, the first full quarter of operations on the Aegean Marine Network, and expect to drive future results in this broad region by utilizing our significant working capital base to increase market share, realizing important operating synergies with our Belgium-based subsidiary, Bunkers at Sea, and capitalizing on our elite reputation for providing consistent, reliable, and world-class services.

*     *     *

KEVIN STERLING: Okay. Thank you. Peter and Nick, this is more of a general question. Going back to Verbeke, I look at it in the quarter -- you guys made Verbeke very profitable, in my opinion, based upon the taxes you paid. I think much more profitable than what it was as a standalone company. And the profits -- I would love to hear your thoughts, if they even exceeded your expectations. And if so, Peter, can you talk about some of the things that you guys have done in Verbeke in a just a matter of three months to get that operation so profitable, and how should we think about Verbeke going forward as well?

PETER GEORGIOPOULOS: Nick, you want to take that, and then I'll add in?

NIKLAS TAVLARIOS: Sure. Yes. Kevin, let's start off and say that Verbeke in one quarter almost did what it did in all of last year. So, it had an extraordinary quarter. How did we do that? Well, first of all, and we said this in our opening comments, we introduced more liquidity to Verbeke than it had before. Okay? It also was complemented by our sales network. So, when you put those things together -- you've got greater liquidity, a stronger sales network, you have a brand as strong as ours is in the global presence is a stronger business than it was.

Now, I can't really forecast for you what I think it will do the balance of the year. I know it's going to be better than it was before, okay, and clearly we've been successful and everybody's charged up about doing very, very well. We're thrilled about how well they did. But I'm not -- I don't have enough history to say, okay, here's what I think for the year. And for that matter, we don't guide. Hope that helps, though.

KEVIN STERLING: It does.

PETER GEORGIOPOULOS: And again, I hate to repeat myself, but you're someone that's understood what's going in Verbeke. I had someone send an e-mail to me this morning saying, it looks like Verbeke underperformed. I don't know -- I wish I

could underperform like that where I had to pay a lot of taxes. It doesn't make sense to me, how people don't understand these simple things.

In response to a question regarding the Company's core business in Singapore, Defendant Tavlarios stated, in pertinent part, as follows:

> KEVIN STERLING: Right. Okay. And then one last follow-up -- one last question, and I appreciate your time today. Peter and Nick, when you look at Verbeke and clearly profitable, I think exceeded your expectations, can you talk little bit about your core business in the quarter? Singapore, Gibraltar, your core business, how that did from either a gross margin perspective and a volume perspective. And how should we think about the core business in the next six to 12 months, and how you can combine the leverage with Verbeke and the leverage with the core business to really get that EPS leverage? I would love to hear your comments about the core business in the quarter as well, if you don't mind.
>
> NIKOLAS TAVLARIOS: Yes, Peter, thank you. Kevin, it's -- our core business has put out -- let's just say about another -- it put close to 2 million tonnes worth of volume out. I'm talking outside of Verbeke. Close to 2 million tones worth of volume in that quarter, and I think you'll recall what we did in the prior quarter. So that is a significant figure.
>
> It's much, much bigger than it was before. We see strength in our core business, and our volume is there. Okay? So, there's strength in the markets, they're generally in the volume. We feel our profit margins are respectable. And we have a good outlook on that for the future.
>
> So, again, good strength in those markets. We are seeing -- obviously, if there was a different margin, like -- I think it was brought up by Doug earlier -- in some of those markets, the leverage to our business is tremendous. Okay? And we would have seen a very, very different figure. We're very happy with what we have done here. Our story is on track. Our plan is very strong, and our outlook for July is excellent, as you can see by the volume that we told you of earlier, and I guess that really sums it all up.

33.     In reaction to Company's second quarter financial results, the price of Aegean Marine stock fell $3.40 per share, or 18%, to close at $15.65 per share, on heavy trading volume. However, Defendants continued to conceal the true scope and extent of the Company's problems.

34.     On November 10, 2010, Aegean Marine issued a press release announcing its financial results for the third quarter of 2010, the period ended September 30, 2010. For the quarter, the Company reported net income of $4.6 million, or $0.10 basic and diluted earnings per share, and

total revenues of $1,340.0 million.  Defendant Tavlarios commented on the results, stating, in

pertinent part, as follows:

> During the third quarter, Aegean Marine increased sales volumes by more than 75%
> compared to the year-earlier period.  However our results for the quarter reflect a
> change in the competitive landscape across our geographical portfolio, particularly in
> our two largest markets, which adversely affected gross spread.  The industry
> experienced an increase in the supply of marine fuel together with a change in buying
> patterns by shipowners, who used increased downtime to fill their marine fuel
> requirements through smaller purchases in a higher number of ports.  Additionally,
> our performance for the quarter was impacted by one-time restructuring charges for
> our Vancouver market as well as unrealized foreign exchange loss related to our
> Verbeke Bunkering subsidiary.
>
> With a comprehensive marine fuel solution from procurement to delivery, combined
> with considerable access to capital, Aegean Marine's future prospects remain strong.
> Our unique business model creates attractive leverage opportunities and we expect to
> increase our long-term earning potential as we continue to expand our global full-
> service platform and meet the strong demand for our vertically integrated services.

Defendant Gianniotis also commented on the results, stating, in pertinent part, as follows:

> Aegean Marine's results for the third quarter of 2010 reflect significant sales volume
> growth in core markets located in Singapore and the UAE as well as contributions
> from new markets.  With a strong capital structure, including more than $700 million
> in working capital credit facilities, we remain well positioned to enhance future
> performance.

35.     Following the issuance of the press release, Aegean Marine held a conference call

with analysts and investors to discuss the Company's earnings and operations.  With regard to the

Company's sales volume in Singapore and Rotterdam, among other places, Defendant Tavlarios

stated,

> During the third quarter, sales volumes in Singapore decreased on a sequential basis
> as we turned down less profitable transactions.  Sales volumes in our other core
> markets located in Greece, the UAE, and Jamaica, were relatively flat compared to
> Q2 2010. Sales volume in Gibraltar registered a positive growth rate on a sequential
> basis during Q3 due to favorable weather conditions, strong ship traffic, as this port
> continues to expand.
>
> And northern Europe, which includes both Verbeke and Bunkers at Sea, sales
> volume contracted as we remained focused on integrating our operations and
> realizing important synergies between these two subsidiaries.  We expect to drive

- 16 -

further results in this broad region by capitalizing our industry brand and utilizing our significant working capital base to increase market share. Sales volumes in the UK decreased in Q3. Our outlook for this market remains strong as we maintain our focus on growing our low sulfur fuel business in the UK.

In response to questions regarding the decrease in volume in Singapore and Rotterdam, Defendants

Tavlarios and Georgiopoulos stated, in pertinent part, as follows:

KEVIN STERLING: Let me ask the competitive question, maybe another way to help me understand. When I look at industry Singapore bunkering volumes and Rotterdam bunkering volumes for the industry, they're pretty healthy. So I would think that with good demand and in those large ports, pricing would not be as competitive. What am I missing?

NIKOLOS TAVLARIOS: The other part to this Kevin, is there is a big supply of residual fuel out there right now. So there is an abundance of supply and that is the other part that creates the whole competitive scape.

KEVIN STERLING: Okay, along those lines, what's driven that excess supply of product? How has that come about, can you share little color there?

NIKOLOS TAVLARIOS: Yes, I would say it's crack spreads, Kevin. When you think about the refiners right now are not producing as much of the cleaner products and so they are generating residual fuel, and that's whats happening, so there's a lot more residual fuel available on the market. And you hear this across the board when you look at other businesses that engage in the bunkering business, they're saying the exact same thing, this isn't something unique, we are all facing this.

PETER GEORGIOPOULOS: We actually saw a press release from another company that had the same issues

KEVIN STERLING: Okay, how much excess supply do you think there is? Can you quantify that?

PETER GEORGIOPOULOS: No, I don't think I can. The only thing I will say is that when you focus on or when you read some of the information that is out there, particularly some of the productions by the IEA you will hear that the demand is expected to lift particularly for clean products and next year, so that could gobble up some of the supply that is out there.

KEVIN STERLING: Okay. Along those lines too, because I've known you guys for years, and I haven't seen this type of situation before. Could you step back when AGN was a product company have you seen a situation like this with excess supply such competitive pricing and maybe how long it took for the industry to work through that? Have you seen this in your career before?

PETER GEORGIOPOULOS: We haven't seen it either, but if you remember, we got involved right before the Company went public, but looking back through the Company's records, there was a period, was it 2004, Nik?

NIKOLOS TAVLARIOS: 2004.

PETER GEORGIOPOULOS: Where spreads hit $18. But it did, I think after a quarter of two, it sort of cleaned itself out.

KEVIN STERLING: Okay, so it's a key, I guess it's a key for the industry sounds like working through this excess supply, is that the right way to think about it?

PETER GEORGIOPOULOS: Yes I think so, and again you know as Nik and I both said a minute ago, look we had a tough quarter, we are not going to make any excuses for ourselves, but if you look at it, look at the press releases from some of our competitors you'll see that, I think they say there working through the same issues, sort of an industry wide problem. The one thing that frustrates us is, and again, not making any excuses, but we have grown the business, we are doing the blocking and tackling, we are setting up the stations, we're utilizing the ships, if you look at the utilization, If you look at the utilization it was sort of flat, even though the number of ships has grown considerably in the last couple of quarters. Utilization per ship. And I've said this many times, we control our costs we can control the volume we push through the ships, we can't control prices and I think this quarter has really proven that to. You know, has over proved that comment, and as I said, it's something that has happened to the industry wide and then hit us particularly hard.

\*      \*      \*

PETER MAHON, ANALYST, DOUGHERTY & CO: Yes, good morning guys. Most of my questions have been answered, except I have probably two more. Getting back to the spread, you know, there a couple public announcements or forums, let's call it early October, mid-October. You guys had said at that point in time that spreads should increase sequentially. It seems like a very short amount of time for spreads to just drastically to degrade. Can you give us a little bit more color? What changed in the landscape that really drove that? It doesn't seem to me like the landscape in Singapore has really changed all that much. It has always been a very competitive market. So can you provide us a little more color on that?

PETER GEORGIOPOULOS: Who said that spreads were high in October?

PETER MAHON: Well there were a couple forums I think you had a conference in early October, on the quarter call, last quarter call you said that margins were improving they should be up sequentially

PETER GEORGIOPOULOS: I think what happened on the last call we did say that in July margins had bumped up and then in August and September that's when we got hammered. So, I think they were up slightly in July over Q2 and then came

- 18 -

down drastically in August and September, and I think maybe that is what you are referring to. But yes, I think it did happen that fast.

With regard to the Verbeke acquisition, Defendant Gianniotis stated, in pertinent part, as follows:

> As a reminder, Verbeke has historically generated lower margins as a result of its spot-based business model, focusing on purchasing marine fuels from refineries and major oil producers and providing sales and delivery services on the same day. In addition, Q3 is historically a slow quarter for Verbeke due to several factors. On slide 10 we provide our Company-wide utilization which is measured as volume delivered per vessel per day. Gross utilization was 533.5 metric tons, a decline of 1.7% from Q2 2010 which is roughly 9 tons per vessel per day, bearing in the mind the growth in our model bunkering feed. Adjusted utilization, which excludes both scheduled and unscheduled of non-operating or off-hire days was 543.4 metric tons, a decrease of 4.1% from the previous quarter.

36.     In reaction to this announcement, the price of Aegean Marine stock fell $5.68 per share, or 36%, to close at $10.28 per share, on heavy trading volume.

37.     Then, on February 3, 2011, the Company issued a press release announcing its preliminary financial results for the fourth quarter of 2010. For the quarter, the Company expects to report a net loss between $12.0 million and $13.0 million, or between $0.26 and $0.28 basic and diluted loss per share. Defendant Tavlarios, commenting on the preliminary results, stated, in pertinent part, as follows:

> Results for the fourth quarter of 2010 reflect continued competition in our largest markets and ongoing softness in the maritime industry, which has led to a gross spread below our expectations. Our preliminary results also reflect higher operating expenses related to our bunkering delivery fleet. While we improved gross spread and returned to profitability during the months of December and January, management continues to take proactive measures to increase sales volumes at higher margins and drive future performance. Specifically, we plan to launch operations in Cape Verde, strategically located off the coast of Western Africa along major trade routes, in the first quarter. We also intend to enter two new additional startup markets with attractive growth potential by the end of the second quarter and third quarter of 2011, respectively, to further strengthen Aegean Marine's geographical sales mix. Additionally, we expect to commence operations in the first of the three new onshore storage facilities during the second half of 2011 in Tanger Med, Morocco, capitalizing on the increasing demand for onshore storage, enhancing our purchasing power for marine fuel and generating leasing income from third parties.

Complementing these efforts, we remain focused on improving our cost structure and increasing fleet utilization. Consistent with these important objectives, we intend to monetize two or three of our older non-core bunkering vessels and divest at least two of our five floating storage facilities by the end of the year. We also expect to redeploy additional bunkering tankers from their existing locations to other markets within our global network to optimize our performance. While market conditions across the global marine fuel supply industry remain challenging, we believe both the positive long-term industry fundamentals and Aegean Marine's growth prospects remain intact. With significant access to capital and a vertically integrated energy logistics chain, both core differentiators, Aegean Marine is well positioned to emerge from the current downturn as a stronger Company.

*     *     *

In addition, we expect to increase the Company's voyage revenues in the current first quarter. By chartering-out five double-hull bunkering tankers on short-term contracts with high credit quality counterparties, we will add to our revenues line while we ensure a level of stability in our expenses.

Defendant Gianniotis added, in pertinent part, as follows:

Aegean Marine's strong capital structure, with more than $700 million in working capital credit facilities, enables our Company to manage fluctuating marine fuel prices and procure large quantities of supply at a discount relative to our competitors. We continue to work closely with our banking group with the goal of expanding our lending facilities under favorable terms.

38.     Upon this news, the price of Aegean Marine stock fell $2.22 per share, or 20%, to close at $8.68 per share, on heavy trading volume.

39.     The market for Aegean Marine common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Aegean Marine common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Aegean Marine common stock relying upon the integrity of the market price of Aegean Marine common stock and market information relating to Aegean Marine, and have been damaged thereby.

40.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Aegean Marine common stock, by publicly issuing false and misleading

statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

41.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Aegean Marine's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Aegean Marine and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

**Additional Scienter Allegations**

42.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Aegean Marine, their control over, and/or receipt and/or modification of Aegean Marine's allegedly materially misleading misstatements and/or their

associations with the Company which made them privy to confidential proprietary information concerning Aegean Marine, participated in the fraudulent scheme alleged herein.

43.    Defendants were further motivated to engage in this course of conduct in order to enable the Company to complete a public offering of its shares whereby the Company sold approximately 4.5 million shares and reaped over $147 million in gross proceeds.

**Loss Causation/Economic Loss**

44.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Aegean Marine common stock and operated as a fraud or deceit on Class Period purchasers of Aegean Marine common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Aegean Marine common stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of Aegean Marine common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

45.    By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Aegean Marine's business and prospects. Defendants' false and misleading statements had the intended effect and caused Aegean Marine common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $33.93 per share on January 8, 2010.

46.    As a direct result of Defendants' disclosures on August 11, 2010, November 10, 2010, and February 3, 2011, the price of Aegean Marine common stock fell precipitously, falling by a collective $11.30 per share, or 60%. These drops removed the inflation from the price of Aegean

Marine common stock, causing real economic loss to investors who had purchased Aegean Marine common stock during the Class Period.

47.    The 60% decline was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price decline in Aegean Marine common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Aegean Marine common stock and the subsequent significant decline in the value of Aegean Marine common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**

48.    At all relevant times, the market for Aegean Marine common stock was an efficient market for the following reasons, among others:

(a)    Aegean Marine common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    as a regulated issuer, Aegean Marine filed periodic public reports with the SEC and the NYSE;

(c)    Aegean Marine regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Aegean Marine was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

49.     As a result of the foregoing, the market for Aegean Marine common stock promptly digested current information regarding Aegean Marine from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Aegean Marine common stock during the Class Period suffered similar injury through their purchase of Aegean Marine common stock at artificially inflated prices and a presumption of reliance applies.

**No Safe Harbor**

50.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Aegean Marine who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of
### the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

51.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

52.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

53.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

54.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Aegean Marine common stock.  Plaintiff and the Class would not have purchased Aegean Marine common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

55.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Aegean Marine common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

56.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

57.     The Individual Defendants acted as controlling persons of Aegean Marine within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Aegean Marine, and their ownership of Aegean Marine stock, the Individual Defendants had the power and authority to cause Aegean Marine to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: February 9, 2011

ROBBINS GELLER RUDMAN
 & DOWD LLP
SAMUEL H. RUDMAN
MARIO ALBA JR.


SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

DYER & BERENS LLP
JEFFREY A. BERENS
303 East 17th Avenue, Suite 300
Denver, CO  80203
Telephone: 303/861-1764
303/395-0393 (fax)

HOLZER, HOLZER & FISTEL, LLC
MICHAEL I. FISTEL, JR.
MARSHALL DEES
200 Ashford Center North, Suite 300
Atlanta, Georgia 30338
Telephone:  770/392-0090
770/392-0029 (fax)

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint and authorized its filing.

2.    Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.  I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4.    Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost |
|---|---|---|---|
| ANW | 2/23/10 | 675 | $29.89/per share |
| | | | $20,175.75 total cost |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds |
|---|---|---|---|
| ANW | | | |

5.    During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _8th_ day of _February_ 2011 in _ROCKAWAY BEACH_   _NY NY_.

City        State

(Signature) X _____

PAUL KOKKINIS